213 P.3d 941 (2009)
Gary Allen SEE, Christine K. Anderson, Delbert Fletcher, Jr., Ted D. Fletcher and Charlotte A. Schoonover, Appellants,
v.
Robert A. HENNIGAR, Respondent.
No. 27773-9-III.
Court of Appeals of Washington, Division 3.
August 20, 2009.
*942 Michael E. de Grasse, Attorney at Law, Walla Walla, WA, for Appellant.
Michael V. Hubbard, Attorney at Law, Waitsburg, WA, for Respondent.
KORSMO, J.
¶ 1 The death of Arlene Fletcher Hennigar led to conflicting claims to the life estate in the farm she had received from her late husband, Delbert Fletcher. Her new husband, Robert Hennigar, claimed the farm under the couple's community property agreement, while the children claimed the property under Delbert's will. The trial court found the agreement controlling and awarded the farm in fee simple to Robert. We conclude that while execution of a community property agreement changes the characterization of the formerly separate property, it cannot change the essential nature of that property or convey more than the grantee (or marital community) held. We reverse and remand.

FACTS
¶ 2 When Arlene married Delbert, each had children from their previous marriages. Delbert owned and operated a farm near Dayton. In 1983, Delbert made a will in which he left his farm to Arlene for life, and empowered her to mortgage or sell the property. At her death, the farm was to go to three of his five children and Arlene's two children (the children). Delbert died in 1984.
¶ 3 Arlene married Robert Hennigar in 1989. The following year, the couple entered into a three-pronged community property agreement (CPA) "in consideration of the love and affection" each had for the other. The agreement converted all of the parties' current and any future separate property into community property and, on the death of one of them, vested title in fee simple to the survivor.
¶ 4 Robert and Arlene farmed the property. Arlene died in 2007. Robert continued to farm the land. The children claimed the *943 property and eventually filed suit to quiet title in the real estate. They also filed a lien on the 2008 crops.
¶ 5 The parties filed cross motions for summary judgment. The trial court granted Robert's motion, quieted title to the farmland in him in fee simple, and quashed the crop lien. The court reasoned that the community property agreement effected a "sale or equivalent" of the real property. The court cited six factors in its decision: (1) Arlene's "full power to sell or mortgage" the property; (2) there was no evidence that the CPA was a sham transaction; (3) a sale normally consists of consideration and a disposition or transfer; (4) the CPA was supported by adequate consideration and effected a disposition of the property, thus constituting a "sale or functional equivalent" of the land; (5) Washington's policy favoring community property rights; and (6) doing otherwise would deny Robert the benefit of his bargain when he entered into the CPA.
¶ 6 The children then timely appealed to this court.

ANALYSIS
¶ 7 It is arguable that Arlene's death simultaneously caused two irreconcilable actions with respect to the farm: (1) transfer of the land to Robert under the CPA; and (2) transfer of the land to the children as the remaindermen under Delbert's will. The Washington Supreme Court once faced a similar problem on analogous facts, leading Justice Utter to comment: "Which `instantaneous' event takes place first might muddle metaphysicians for millennia." Lyon v. Lyon, 100 Wash.2d 409, 414, 670 P.2d 272 (1983). We are in agreement and believe that comment aptly applies to appellate judges as well. Nonetheless, we are required to promptly resolve this issue. Id. We find guidance in the ancient law of real property and descent.
¶ 8 The CPA used here is one of the classic three-pronged agreements contemplated by RCW 26.16.120 and well described in our case law and legal literature. The essential features are that (1) any currently possessed separate property is immediately converted to community property; (2) any property obtained in the future that would otherwise be separate property also is immediately converted to community property; and (3) the surviving spouse takes all property as separate property immediately upon the death of the other spouse. Harry M. Cross, The Community Property Law in Washington, 49 WASH. L.REV. 729, 799, 805 (1974);[1]In re Estate of Bachmeier, 147 Wash.2d 60, 63-64, 52 P.3d 22 (2002). The effect of such an agreement, Professor Cross noted, "is that neither spouse will have any separate property while both live." 49 WASH. L.REV. at 807. A CPA is often used as a substitute for a will. In re Estate of Verbeek, 2 Wash.App. 144, 153, 467 P.2d 178 (1970).
¶ 9 A life estate is limited in duration to the life of a named person or persons. 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW, § 1.4, at 6 (2d ed.2004). A life interest can include the power of disposition, allowing the grantee to sell or otherwise consume or dispose of the property while living, but the grantee has no power to dispose of the property after death. Id.; Parr v. Davison, 146 Wash. 354, 356, 262 P. 959 (1928); Porter v. Wheeler, 131 Wash. 482, 486-487, 230 P. 640 (1924).
¶ 10 Respondent contends that Lyon is instructive and favors his position. The case is instructive, but it is distinguishable. There, a father had given two sons some real estate as joint tenants. One of the sons was married and, at the time of the gift, had a three-pronged community property agreement in place. 100 Wash.2d at 411, 670 P.2d 272. The married son died and his brother claimed the property under the right of survivorship attaching to a joint tenancy. The widow claimed her husband's share of the property under the CPA. Id. at 410-411, 670 P.2d 272. The Supreme Court agreed with the widow, finding that the existence of the CPA meant that the deceased son's marital *944 community, not merely the son, had been the joint tenant with the other brother. Id. at 410-411, 413, 670 P.2d 272. The court noted that the policy of this state favors community property and disfavors joint tenancies. Id. at 414, 670 P.2d 272. The effect of the transfer of the community's interest to the surviving spouse worked to transform the joint tenancy into a tenancy in common. Id.
¶ 11 The facts of Lyon easily distinguish that case from this one. First, in Lyon the CPA was in existence at the time the real estate was transferred to the two sons; here, the CPA was not entered into until many years after the life estate was created. Second, while joint tenancies are disfavored, Washington law does not disfavor life estates. Third, the property interest conveyed in Lyon was in fee rather than the limited duration life estate Arlene received from Delbert. All of these distinctions are important, but the latter is critical.
¶ 12 It is axiomatic that a person cannot convey a greater interest in real estate than she owns. Firth v. Lu, 146 Wash.2d 608, 615, 49 P.3d 117 (2002); McGill v. Shugarts, 58 Wash.2d 203, 204, 361 P.2d 645 (1961). That principle has been applied in many different real estate contexts. E.g., McDuffie v. Noonan, 176 Wash. 436, 439, 29 P.2d 684 (1934) (leasehold); Easly v. Easly, 78 Wash. 505, 139 P. 200 (1914) (partition action); McDowell v. Beckham, 72 Wash. 224, 130 P. 350 (1913) (holder of life estate could only transfer a life estate). Arlene simply could not transfer to the community a greater interest in the farm than she held.[2] While a CPA can change the identity of an owner from an individual to a marital community, it cannot magically transform the nature of the property that is owned. An owner of property cannot enlarge the property by means of transferring it to another.
¶ 13 At oral argument, counsel for the appellants gave an example of the absurdity that could arise in this situation. Under the trial court's interpretation, if Arlene had survived Robert she would have obtained a fee simple interest in the property upon his death even though she had transferred only a life estate to the community under the CPA. The simple act of entering into the CPA would terminate her life estate and grant her a greater fee estate. We find no precedent in property law for such an outcome.
¶ 14 Robert argues, and the trial court agreed, that transferring the farm to the children deprived him of the benefit of the bargain when he entered into the CPA. He is incorrect. The CPA was effective to transform the life estate to a community asset instead of merely being Arlene's personal property. That meant that Robert had equal authority to manage the property under our community property statute. RCW 26.16.030.[3] It also meant that if Arlene had wanted to sell the real estate, as Delbert's will had allowed, Robert would have had to consent to the sale. RCW 26.16.030(3). In short, while the estate existed, Robert had all of the rights that Arlene possessed in the property by nature of the fact that it was now community property. He had the benefit of his bargain.[4]
¶ 15 The trial court also equated the effect of the CPA on the farm as a "sale" due to the existence of consideration and a transfer. A life estate can be transferred by the grantee. McDowell, 72 Wash. at 226, 130 P. 350. However, a life estate is all that the grantee could transfer in that situation. Id. If there was a "sale" here at all, it was the sale of a life estate, not a fee interest. We hesitate, however, to classify a CPA as a sale or other conveyance of an interest in real property.[5] Numerous such agreements have *945 been entered into over the years without suggestion that they constituted a current transfer of an interest in real estate, potentially triggering tax,[6] recording, and other consequences. Instead, a standard CPA seems to work nothing other than a re-characterization of the nature of property without actually transferring that property.[7] It is unknown which spouse will ultimately survive the other and take the former community property as separate property. Any future interest of the non-donating spouse is uncertain and may never come to fruition. The community interest in the property largely appears to be one of management rather than title. We conclude that the conversion from separate to community property was not a "sale" of the farm from Arlene to her new marital community.
¶ 16 The CPA effectively re-characterized Arlene's life estate from separate to community property, but it was not a sale of that property. The community property laws could not increase the nature of the property that the community now jointly held. The life estate ended when Arlene died. Accordingly, there was no interest in the farm to be transferred to Robert. By the terms of Delbert's will, the farm now belonged to the five children.
¶ 17 The judgment of the trial court is reversed and the case remanded for further proceedings.
WE CONCUR: SCHULTHEIS, C.J., and KULIK, J.
NOTES
[1] The article was updated eleven years later. See Harry M. Cross, The Community Property Law in Washington (Revised 1985), 61 WASH. L.REV. 13 (1986). The updated article contains the same views as those cited here.
[2] As more poetically stated in the Brief of Appellants at 9: "Neither love nor legal instrumentation can lengthen a life estate's duration."
[3] In the event of dissolution, the property would have been characterized as a community asset instead of Arlene's separate property.
[4] It also appears that even without consideration of the farm property, Arlene brought more assets to the marriage than Robert. He is not in a position to claim the agreement was unfair.
[5] Professor Cross considered changing the character of property as "essentially a transfer or conveyance." He therefore recommended doing so with the formality necessary for the type of property involved. 49 Wash. L.Rev. at 806.
[6] E.g., RCW 82.45.010; RCW 82.45.060 (real estate excise tax).
[7] "A community property agreement as applied to after acquired property does not instantaneously convey initially separate property to the community but merely labels all after acquired property community immediately upon receipt." Lyon, 100 Wash.2d at 412, 670 P.2d 272.